SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY: CRIMINAL TERM, PART K-11

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, | Return Date: August 24, 2023 |
| -against- | AFFIRMATION IN SUPPORT OF MOTION TO VACATE JUDGMENT OF CONVICTION |
| EARL WALTERS, Defendant. | Queens County Indictment No: 4505/1992 |

**John F. McGoldrick**, an attorney admitted to practice law in the State of New York, affirms the following statements to be true under the penalties of perjury pursuant to C.P.L.R. § 2106, as follows:

1. I am an Assistant District Attorney in the Conviction Integrity Unit [CIU] of counsel to Melinda Katz, the District Attorney of Queens County. I submit this affirmation in support of a joint motion to vacate Earl Walters's conviction pursuant to section 440.10(1)(g) of the Criminal Procedure Law based on newly-discovered fingerprint evidence.

2. The facts stated in this affirmation are the findings and final report of the CIU's investigation of Walters's 1994 conviction. This affirmation represents all of the findings, conclusions, and inferences drawn by the Conviction Integrity Unit and the Office of the Queens County District Attorney in connection with the decision of the District Attorney's Office to consent to vacate the defendant's judgment of conviction. All other documents generated by the Conviction Integrity Unit or any other part or member of the District Attorney's Office in connection with this investigation are strictly preliminary in nature and made solely for use in

deliberating with regard to the defendant's matter. Any findings, legal conclusions, or inferences drawn in any other report or document were not the basis upon which the District Attorney's Office has agreed to vacatur. I make the statements in this affirmation upon information and belief, based on my review of the records and files of the Queens County District Attorney's Office [QCDA], court records, the records of the New York City Police Department [NYPD] and witness interviews.[1]

**INTRODUCTION**

3. Defendant Earl Walters was convicted of two separate abductions and robberies of lone women on September 2nd and 24th of 1992. Walter's conviction for these crimes rests almost entirely on his confession, made during approximately 16 hours of interrogation while in police custody. Walters later recanted his confession and testified at a pretrial hearing that his confession was false, a claim he also raised at trial and in subsequent appellate proceedings.

4. Newly-discovered fingerprint evidence developed through the CIU's re-investigation of the case now directly implicates two other men in the September 24th abduction --- Robert Masters and Jermaine Williams. As part of the CIU investigation, in 2022, the NYPD Latent Print Section ("LPS") re-examined all of the fingerprint evidence in the case. The LPS identified Williams and Masters as the source of prints found on a stolen grey Mazda that was

[1] This affirmation includes citations to various NYPD documents and other sources that will be made available to the Court upon request.

abandoned (still running) and believed to be used by the perpetrators in the September 24th abduction:

- Jermaine Williams was the source of three palm prints collected from the roof and driver's side door.

- Robert Masters was the source of a single fingerprint collected from the driver's side door.

5. Masters and Williams, who had no apparent connection to Walters, were arrested for committing very similar abductions of women in October 1992.[2] By the time of trial, LPS excluded Walters, and his alleged accomplice Dean Black, as the source of all fingerprint evidence collected in relation to the abductions.

6. Considering the pattern of similar crimes committed over the course of two months, the newly-discovered fingerprint evidence meets the threshold for vacatur pursuant to section 440.10(1)(g) of the Criminal Procedure Law. Had this newly discovered evidence been received at trial, it would probably have resulted in a trial verdict more favorable to Walters. Accordingly, the People and defendant Walters jointly move to vacate Walters's conviction in each of the two September cases, prosecuted under Queens County Indictment Number 4505/1992. Further, the People move to dismiss the indictment.

---

[2] Masters and Williams (and a third man named Kraigory Odom) were arrested for three October carjacking / robbery / sex assault cases, Queens County Indictment No. 4768/1992. Masters pleaded guilty to two of the abductions and Williams to one.

## FACTUAL BACKGROUND

### A. The September Crimes for which Earl Walters was Convicted.

7. On September 2nd and September 24th of 1992, two men carjacked two lone women[3] as the women parked their cars alone late at night. Each woman was assaulted (one sexually), forced to lie on the floor in the back of their cars and taken to ATM machines in Queens where they were robbed.

***(1) The September 2, 1992, Borough Park Brooklyn carjacking, assault, and ATM robbery***

8. On the night of September 2nd, two Black men approached and abducted a twenty-eight-year-old woman as she parked a friend's car in front of her building in Borough Park, Brooklyn. They pistol-whipped her, threw her in the back seat, made her lie on the floor and drove her to Queens where they took money from an ATM using her bank card.

9. She described the incident to several detectives from Brooklyn. She had parked in front of 1453 55th St. in Borough Park when the two men approached her as she exited.[4] The first said, "Get in the car," as he approached her from the driver's side. They pushed her into the passenger seat. One entered the driver's seat. The other man got in the back.[5] The driver had difficulty starting the car because the seat belts had to be fastened to engage the ignition. When

---

[3] For privacy concerns, the names of the complainants will not be used in the pleading. The victim of the September 24th crime is deceased. The CIU and the QCDA Crime Victim Advocacy Program are in contact with the victim of the September 2nd crime and have advised her of the CIU investigation and the range of possible outcomes.

[4] DD5 Number 2, September 3, 1992; DD5 Number 4, September 3, 1992.

[5] *Id.* as to both.

she tried to escape through the front passenger door, the man in back hit her in the head with a gun and said, "Quit messing up." He then said, "Sit and look normal."[6]

10. At some point, one of the men dragged her into the rear of the car and told her to lie on the floor as he sat above her. The driver rifled through her bags and found a Citibank card and demanded the PIN. She then heard them ask pedestrians where a Citibank was and heard one person say, "Hillside." The men drove to a Citibank that might have been on Hillside Avenue in the 70s or 80s. But the men could not initially withdraw money. The victim then realized the men were using the wrong ATM card. When they found the correct card, the men successfully withdrew funds with the PIN provided by the victim.[7] Bank records showed that the men had withdrawn $1,900 from the Citibank ATM at 164th Street and Hillside Avenue.

11. After they stole the victim's money from the ATM, the two men asked her if she wanted a ride back to Brooklyn. She said no,[8] and they let her out in Queens at about 1:40 a.m. She left her handbag containing cash and credit cards in the car. The victim saw a Housing Police car shortly thereafter and the officers took her to Jamaica Hospital where she was treated for contusions to her neck and back and cuts to her head that required five stitches to close.[9] She did not report any sexual abuse, and no Vitullo (sex crime) kit was prepared. The Volkswagen Golf

---

[6] DD5 Number 4, September 3, 1992.

[7] *Id.*

[8] *Id.*

[9] Trial: 1179.

that the men stole from her was not found until months later after it was stripped, and all potential forensic evidence destroyed.[10] None of the items that she had reported stolen were recovered.

***(2) The September 24, 1992, Flushing Queens carjacking, sexual assault, and ATM robbery***

12. Around midnight on September 24th, 1992, a fifty-eight-year-old woman was parking her 1984, four-door, maroon Renault around the corner from her apartment on 35th Avenue in Flushing, Queens. She put her steering-wheel lock on and was getting out of her car when two Black men in a small grey car pulled up. The passenger jumped out, pushed her back into her car, punched her in the face, slammed her head repeatedly into the steering wheel and then shoved her down. The man then threw her over the seat into the back, jumped over the seat, and pressed her down onto the floor, taking out a black gun and holding it to her. The second man began to enter the driver's door, but the first told him to, "Get the blanket!" and the next thing she knew, she was covered with a blanket.[11]

13. When the second man could not get the steering wheel lock off, she told him that he could undo it with the small key. The second man then went through her purse, asked if she had an ATM card and threatened to kill her. The second man then threw the purse into the back seat and the first man handed it to her, demanding that she find her ATM card. After she located the card in the zipper part of her purse, the men demanded her PIN and bank information. She told them her number and that the branch was on Northern Boulevard—hoping that they would

[10] Trial: 1356, 1370.

[11] September 25, 1992, DD5.

drop her off there. They asked her if the ATM card worked at NYCE machines, and she said it did.[12]

14. The man in the back seat began asking her if she wanted to have sex and said, "You white bitch I'm going to fuck you." He reached under the blanket ripped off her stockings and underwear and started fondling her vagina.[13]

15. The driver stopped the car, asked for the PIN again and left. The man in back continued to fondle her. The driver returned after about ten or fifteen minutes annoyed that there was only $240 in the account. [14] Both discussed killing her and picking up another person, and then drove off. [15]

16. At some point, the driver stopped the car and tried to pick up some women saying, "Want to party?" The women responded, "Four of us and only two of you? Do you have some friends?" The man in back assured the women that they could handle them. The man in back became more aggressive and started scratching the victim's inner thigh and jamming his fingers in her. She heard one of the men say that they were in Brooklyn. The two men spoke for a while, "But she could not make out a lot of the conversation due to there (sic) accents (Jamaican)." The driver said, "Let's go to the railroad." And they drove for 10 minutes and stopped. [16]

---

[12] *Id.*

[13] *Id.*

[14] *Id.*; Trial: 1015.

[15] September 25, 1992, DD5.

[16] *Id.*

17. After stopping, the two men told the victim to get on her stomach and removed the blanket. The man in the back seat tried and failed to tie her hands behind her back with a rope, then put the rope around her neck and strangled her while he threatened to kill her. They demanded that she get out of the car, but she was unable to move. The two then dragged her out of the car, made her walk to a cyclone fence next to the tracks, picked her up by her feet and under her shoulders and threw her over the fence. As she lay on the far side of the fence, they urinated on her.[17]

18. After waiting to make sure they were gone, the victim freed herself from the rope and made her way to a bodega where she called 911. The responding unit took her to Long Island Jewish Hospital where she was treated for multiple contusions. Hospital personnel prepared a Vitullo (sex crime) kit.[18] The victim described the men as in their 20's and speaking with Jamaican accents.[19]

***(3) The car used by perpetrators in the September 24th crime was found running at the scene of the abduction.***

19. At 2:47 a.m. on the morning of the September 24, police found a grey, four-door, Mazda sedan, on 35th Avenue between 149th Street and 149th Place, the same location where the abduction occurred. The car was double parked, and the engine was running. The driver's-side

---

[17] *Id.*

[18] September 25, 1992, DD5.

[19] September 24, 1992, DD5.

window was down, and the ignition was "popped."[20] Their investigation revealed that the car had been stolen from a residential neighborhood in Nassau County sometime after 6:00 in the evening of September 23, 1992. Investigating officers later concluded that this was the car that the two men used to approach the victim.[21]

20. The Mazda's owner told police that on September 23rd he parked the car in front of his home in Baldwin, Long Island, at about 6:00 p.m. He was not aware it was stolen until the police contacted him at about 5:00 a.m. on September 24th, 1992.[22] Baldwin was a little over one-half hour's drive from the site of the Flushing abduction.

21. The grey Mazda, pictured below, was vouchered and processed by the NYPD Crime Scene Unit:



[20] Vehicle Invoice A599000V. Trial: 1103-1104.

[21] September 24, 1992, DD5.

[22] *Id.*

Police collected several latent prints from the outside of the car. Walters was excluded as the source of all of the latent prints collected from the vehicle.

## B. The investigation leading to Earl Walters's arrest.

22. Walters emerged as a suspect in the September abductions during the investigation of the unrelated murder of Leopold Greaves. Greaves was murdered on September 21st, 1992, after he was carjacked at gunpoint as he waited to pick up a friend at the Jamaica Center subway station. Police developed Dean Black and his and Walter's associate Craig Jackson as suspects in the murder and brought them in for questioning on September 30th, 1992. Both Black and Jackson made statements implicating themselves in the crime.[23] Dean Black and Craig Jackson, were ultimately convicted, at separate trials, of abducting Greaves in his car, placing him in the trunk, and then driving Greaves to Highland Park in Brooklyn where they shot him dead.[24]

### *(1) After his arrest for the Greaves murder, Dean Black provided information suggesting Jackson's involvement in the September 24th Flushing abduction.*

23. On September 30th, 1992, Dean Black confessed to detectives about his participation in the Greaves homicide. During that investigation, Detective Vito Navarra of the Queens Special Victim's Squad [QSVS] also questioned Black and elicited information that

---

[23] Jackson also told police that Walters and a fourth man named Scotchman was present and that Walters shot the victim. This claim implicating Walters was contradicted by statements given by Black, Scotchman, and Walters.

[24] *See People v. Black & Jackson*, Queens County Indictment No. 4458/92.

appeared to concern the September 24 carjacking and robbery that Walters was later convicted of.[25]

24. Black told the QSVS detective that he learned about the September 24th abduction on Eyewitness News Channel 7 on "Thursday" (the night of the abduction).[26] Black said that he saw Craig Jackson, at a McDonald's on the evening of September 24th.[27] According to Black, he saw Jackson driving a car that met the description of the one taken from the victim during the September 24th abduction.[28] Jackson then showed him over $2,000 and admitted that Jackson and an unnamed friend took a female to a bank and took her money from the bank. Jackson said he tied the victim up in the rear of the car while his friend drove her around. She had either escaped, or they let her go.[29] Although Jackson was questioned at length and made a statement regarding the Greaves homicide, he did not make any statement regarding the September 2nd or 24th abductions.

***(2) Neither of the women abducted in September identified Dean Black in lineups.***

25. On the day of his arrest, Black was also placed in lineups for the September 2nd and September 24th abductions. The victim from the September 24th abduction in Flushing did

[25] September 30, 1992, DD5.

[26] *Id.*

[27] On October 2, 1992, the latent print unit determined, in a response to a request from Detective Dana in QSVS, that Dean Black and Craig Jackson's prints did not match the latent prints of value from the September 24th abduction.

[28] This conforms to the pictures on file from the Crime Scene Report of the Flushing victim's maroon, four-door, Renault.

[29] September 30, 1992, DD5. When interviewed by the CIU on September 1, 2022, Black denied ever telling detective Navarra that he had seen Jackson with the maroon car, saying that was, "Bullshit."

not identify him. The victim of the September 2nd abduction from Borough Park, first identified Black as the driver before telling the detectives that she was unsure whether it was Black or one of the other fillers. The QSVS detective ended the procedure, concluding that the September 2nd victim could not identify Black because she continued to be unsure of whether Black or the filler was the driver of the car.[30]

***(3) The September 2nd, Borough Park victim made a tentative identification of Walters from a photo array.***

26. On October 1st, 1992, QSVS detectives reinterviewed the Borough Park victim at her job.[31] Detective Navarra showed the victim a photo array that included Walters's photo at position number two. The victim looked at the array for four or five minutes and then stated that number two (Walters) looked like the person who was in the back seat with her, and she would be sure if she saw him in person.[32]

27. That same day, QSVS detectives showed the Flushing victim two photo arrays, one containing Earl Walters's photo and another Craig Jackson's photo. She did not identify anyone.[33]

---

[30] September 30, 1992, DD5.

[31] October 1, 1992, DD5.

[32] *Id.*

[33] *Id.* The Flushing victim was shown a lineup with Dean Black and did not identify him. 9/30/1992 DD5.

### C. Walters's arrest, interrogation, and statements regarding the Greaves murder and September abductions

28. Walters was initially taken to the precinct for questioning on the morning of October 7th, 1992, by homicide detectives and first interviewed concerning the Greaves murder. Walters signed a statement as a witness to the Greaves homicide. He was later interrogated by Detective Navarra from QSVS concerning the September abductions. During the remainder of more than 16 hours of interrogation in police custody, he made multiple statements implicating himself as a reluctant participant in the two September abductions.

#### *(1) Walters's arrest and interrogation concerning the Greaves murder*

29. On October 2nd, 1992, the NYPD Latent Print Unit determined that Walters's thumbprint matched a print recovered from the rear left passenger door at the "top of window interior" of carjacking and murder victim Leopold Greaves's abandoned car. Several days earlier, Jackson had implicated Walters in his confession to that crime. Then, on October 7th, 1992, at about 9:30 a.m., 103rd Precinct Homicide Detectives Murtha and Stea arrested Walters. In the early afternoon, Walters signed a five-page written statement saying that he rode with Black, Jackson, and a third man, Donovan Scotchman,[34] to the murder scene but did not participate. His statement accounted for the presence of his fingerprint in Greaves's car. Walters also implicated Black and Jackson as the abductors and murderers, quoting Jackson saying that they had to kill

---

[34] Scotchman's fingerprints were also found on Greaves's car.

Greaves because he saw their faces.[35] Walters was not charged in the Greaves murder and was treated only as a witness (and not a suspect) by police and prosecutors after his statement.

***(2) Walters's interrogation about the September abductions and written confessions***

30. After Walters made his statement regarding the Greaves homicide, Detective Navarra began questioning Walters at 2:45 p.m. Detective Navarra told Walters that he had been arrested for the September 2nd abduction in Brooklyn because he had been identified by the victim (June 11, 1993, H: 19, 25).[36] The detective also told Walters that he was investigating a sex-abuse case where another woman was abducted and had her money withdrawn from a bank.[37]

31. The detective interviewed seventeen-year-old Walters alone (H: 54). Walters made no admissions during the initial few hours of questioning (H:27). In the beginning, Walters denied that he was present during the September abductions, but he told the detective that he had heard that Black was involved. During this part of the conversation, the detective told Walters that he had spoken with Dean Black who told him, "All about it." This upset Walters (H: 47-49). The detective recounted what Dean Black had said (H: 51).

32. Before Walters made any admission about the crimes, the detective reported that Walters was "asking me basically how much I knew about it. He was trying to get (information) out of me." (H: 49). The detective explained that it:

---

[35] During the CIU investigation, Walters repudiated this statement and claimed that he did not actually accompany Black and Jackson. Instead, he claimed that he only spoke to Black and Jackson when they arrived at Black's home in a car.

[36] "H" followed by a number refers to the page number of Earl Walters Suppression hearing for the abductions (Queens Col Ind. No. 4505/92), beginning on June 11, 1993; *See* October 8, 1992, DD5 p. 1.

[37] October 8, 1992, DD5.

> "Took a few minutes before we went back and forth that I knew about it, and there is no sense hiding it . . . and then we went into where he was telling me about it." (H: 50).

When asked directly whether he had told Walters what he knew about the incident prior to Walters's statements, the detective answered, "No." (H: 55).

33. Before Walters first signed a statement, the detective left him alone in the interview room from time to time and went to locations that they had discussed. The detective "left the precinct, and came back as a result of things that he was telling me, going out and looking" (H: 26, 27, 43, 52, 54). But the detective explained, "I couldn't find the locations that he was describing" (H: 56).

34. Eventually, the QSVS detective memorialized Walters's confession in two written statements. He presented the statements for Walters to sign, and Walters signed them (H: 34). After Walters signed the initial statements, the detective took Walters out of the precinct to identify relevant locations related to the crimes. In a DD5, the detective wrote that Walters agreed to point out the banks and the area where he had said papers[38] had been thrown out of a car during one of the abductions. In addition, the detective wrote, "He took me to a Chase Manhattan Bank at 184th Street and Hillside Ave. and stated that the car was parked on 184th Street off Hillside Ave., next to the bank and facing up hill."

35. The detective then indicated that Walters directed them to a Citibank "on 164th St. off Jamaica Ave," and that Walters then pointed "us to 109th Ave. and Liverpool Street" and

[38] A bag of papers was recovered as part of the investigation into the September 29th abduction. However, there was no evidence connecting the recovered papers to the crime. In Walters's video confession, he inconsistently attributed the papers to both abductions.

indicated that this was where books and papers were thrown out of the car. However, no books and papers were found.[39]

36. After Detective Navarra and Walters went to the banks, Detective Navarra took Walters to the Queens Special Victim's Office at the 112th Precinct. There, at about 9:00 or 10:00 at night, Detective Navarra gave him some food from McDonald's. The detective stated that Walters had not complained that he needed sleep, had to use the bathroom, or that he was hungry (Navarra H: 17-18).

37. At about midnight, Walters then wrote a statement in his own handwriting (H: 28-29; 35-36; 50). Walters's handwritten statement tracked the initial statements written out by the detective. After Walters had written the statements, he and the detective waited for an Assistant District Attorney to take Walters's video statement.[40]

***(3) Walters's video statement***

38. On October 8th, 1992, starting at 2:22 a.m., an ADA took a video statement from Earl Walters with Detective Navarra present. Walters was advised of his *Miranda* rights and then interviewed about the abduction cases sequentially: first describing the September 2nd abduction, then the September 24th abduction. Walters's statements on video generally followed the narrative

[39] October 8, 1992, DD5 p. 3.

[40] *Id.*

in his written statements. However, in the video statement, Walters made numerous assertions that were at odds with the accounts of the victims and with the other evidence in the case.

***(4) Walters was remanded and indicted.***

39. Walters was arraigned on a felony complaint on October 8th, before the Honorable Dorothy Chin Brandt who remanded him without bail.[41] Grand jury proceedings commenced the following day. And on October 29th, a grand jury voted to indict Walters.[42]

**D. Earl Walters's November 24th, 1992, lineup procedure with the September 2 victim.**

40. On November 24th, 1992, Walters was placed in a lineup for the September 2nd victim who had previously made a tentative identification of him in the photo array with the qualification that she would be sure it was him if she saw him in person.[43]

41. The victim viewed a six-person lineup with Walters at position #5. She initially picked a filler in the #4 position. She then retracted that selection and picked a filler in the #6 position. With this second misidentification, officers ended the lineup. The victim then spoke to the QSVS detective about the skin tone of the man at position #5 (Walters). After speaking with

[41] On December 4, 1992, bail was fixed at $250,000.

[42] Walters was charged with Robbery in the First Degree, Robbery in the Second Degree (two counts), Sexual Abuse in the First Degree, Aggravated Sexual Abuse in the Second Degree, Assault in the Second Degree (two counts), Unauthorized Use of a Vehicle in the First Degree, and Kidnapping in the First Degree (Queens County Indictment Number 4505/92).

[43] October 1, 1992, DD5.

an ADA on the telephone, officers brought the victim back and proceeded to do the lineup again. She picked #5 who was Earl Walters.

**E. Three similar abductions in October 1992**

42. In the days following Earl Walters's arrest, and while he was incarcerated, there were three separate nighttime gunpoint carjackings and robberies involving sexual abuse of each female victim. In two of the three incidents, the abductors attempted to rob their victims by bringing them to ATM machines.

***(1) The October 11th, 1992, abduction of a male and female couple in Briarwood***

44. On Sunday October 11th, 1992, at about 1:30 a.m. near 150-29 Hoover Avenue in Briarwood, a married couple were abducted by two men. The victims described their assailants as two Black men wearing masks who approached them from behind as they were about to exit their car. While one held a black handgun to the husband's head, they ordered the two of them back into their own car. One of the carjackers drove, the husband sat in front, and his spouse sat in back with the second carjacker. The driver demanded bank and credit cards and threatened to kill them. The two men drove the couple to the husband's Citibank at 89-50 164th Street in Jamaica.[44] The driver exited with the husband and withdrew an unknown amount of cash using his bank card. In the meantime, in the back of the car, the second man threw the husband's jacket over the female victim's head and pulled her pants down, sticking his fingers in her vagina, tearing her blouse, and

[44] October 11, 1992, Complaint Report indicates that this Citibank was the October 11 victim's husband's branch. This is the same Citibank location used in the September 2 carjacking and robbery.

fondling her breasts. This second man told her to say nothing, or he would "fuck" her and kill her. She told him that she was pregnant. The two abductors then drove back to the scene of carjacking and fled in their own grey car that was parked behind the victims' car. They took the husband's house and car keys. The couple described their abductors as two Black men with Jamaican accents who were in their mid-20s, one 6'2" weighing about 180, the other 5'7" weighing about 170 pounds. According to the couple, the second male wore surgical gloves and had a scar on his left cheek.[45]

***(2) The October 14th, 1992, abduction of a male and female couple in Cunningham Park***

45. On Wednesday, October 14th, 1992, at 12:50 a.m., three Black men brandishing guns approached a woman and her boyfriend as they sat in their car in Cunningham Park. They forced the couple into the back seat. The carjackers then sat, one in the front driver's seat, another in the front passenger's seat, and the last in the center rear passenger seat with the couple. The man in the back seat held a gun to the boyfriend's head and demanded, "Give us what you got." The man in back took the male victim's wallet, the female victim's necklace and searched her for rings. The man in the driver's seat started the car, and the man in the back ordered the female victim to start stripping, shoes first. When she did, the man began fondling her breasts. The man in back struck her with his arm and, when she protested, hit her in the head with the gun.[46] The three men took the couple out of the car and then fled in the stolen car. The boyfriend saw one of the abductors because he lifted his mask when he could not open the glove compartment. The

---

[45] *Id.*

[46] October 14, 1992, Complaint Report. October 14, 1992, Robbery Complaint Worksheet.

victims described the abductors as Black men, wearing masks and gloves, all in their early 20s of various heights and weights: 6’1” weighing 190, 5’11” weighing 160, and 6’0” weighing 180.[47]

***(3) The October 19th, 1992, abduction of a fifty-seven-year-old woman in Bayside***

46. On Monday, October 19th, 1992, at about 8:00 p.m., three Black men forced a fifty-seven-year-old woman who was leaving her recently parked car in Bayside back into her car. They pushed her down onto the back floor of her car and drove to an ATM at 40-52 Main Street in Flushing (Hong Kong Bank). They demanded her PIN but were unable to withdraw money because the ATM instructions were in Chinese. They then drove away with her, beating her with a pipe, ripping off her pants and forcing a key into her anus and vagina. Stopping in a school-yard driveway at PS 130, they attempted to jam her into her own car’s trunk. When the victim screamed, the men hit her in the head several times with a gun and knife, and fled, leaving her near 194th Street and 43rd Avenue.[48]

**F. Cases viewed as a pattern**

47. NYPD documents and other sources suggest that the five abductions spanning from September through October were considered by the NYPD together. The QSVS detective who had obtained Walters’s confessions for the two September cases, also investigated the October 9th abduction of the Briarwood couple by interviewing the female victim and canvassing the area with

---

[47] *Id.* as to both.

[48] October 19, 1992, Complaint Report; October 20, 1992, DD5.

her.[49] On October 21st, 1992, the Queens Robbery Squad [QRS] identified the three abductions attributed to Masters, Kraigory Odom, and Williams as "Robbery Intelligence Pattern Number 83." The pattern "Hot Sheet" indicated that, "The robbery part will be investigated by Queens Robbery in conjunction with the investigation of the Queens Special Victims Squad" [QSVS]. And further, that "other robberies will be examined to see if similarities exist and other boros contacted also."[50]

48. On October 20th, 1992, Detective Thomas Cruthers from the QRS was assigned to investigate a pattern consisting of the three October carjackings and robberies. He conferred with the QSVS detective who had interviewed Walters regarding the three October cases and "received copies of the DD5s and paperwork on the three (3) cases in the pattern and they were made a part of this case's folder."[51] An additional (undated) sheet of paper from the NYPD investigation of the October abductions marked "Notes By Detective Cruthers" contains a list of names and identifying information for a number of persons including references to Earl Walters and Dean Black. There is a note that "auto originally stolen in Nassau Ct. in Baldwin 1017 Schulman place, recovered (illegible) and 116th Ave." presumably referencing the September 24 carjacking. There is an additional note stating "103 Homicide auto recovered > 221 and South Conduit" presumably referencing Leopold Greaves's stolen Honda.

---

[49] October 14, 1992, DD5
[50] Queens Robbery Squad Robbery Intelligence Pattern Number 83, October 21, 1992.

[51] October 20, 1992, DD5

**G. The investigation of the three October cases lead to the arrest of Robert Masters, Kraigory Odom, and Jermaine Williams.**

49. As a result of investigation by the NYPD, on October 21st, 1992, they arrested Kraigory Odom. The investigation had revealed that a bystander heard the October 19th Bayside victim scream when her captors were trying to stuff her into the trunk of her car. He then saw three Black men run to a small light-blue four-door Chevette and took note of the license plate number. After a story ran on the news about the crime, he provided the plate number to the police.[52] Police learned that the car associated with that license plate was registered to an address in Hempstead, Long Island and one of the residents at that location, nineteen-year-old Kraigory Odom, had an arrest record.[53]

50. On October 21st, 1992, the Latent Print Unit informed the QRS that Kraigory Odom's fingerprints had been found on the Bayside victim's car.[54] Kraigory Odom was then arrested at the 109th Precinct.[55] Through Odom, police identified Williams and Masters as additional suspects and the two were also taken into custody. At the time of his arrest, Masters admitted he had a gun in his home, and arresting officers recovered .380 semi-automatic handgun from his basement.[56]

---

[52] October 20, 1992, DD5.

[53] *Id.*

[54] October 21, 1992, DD5.

[55] October 21, 1992, DD5.

[56] October 21, 1992, DD5

51. Masters was taken to QRS, where he signed a statement describing the October Bayside abduction and confessed to "this robbery and abduction."[57] Odom and Williams also made statements to the police on the same date, implicating themselves in the Bayside abduction. Police investigators transcribed the statements. Kraigory Odom signed his, but Jermaine Williams did not.

On that day, in a series of separate lineup procedures:

- The husband from the October 11th abduction identified Jermaine Williams as the man with the gun who rode in the back of his car during the abduction;
- The female victim from the October 14th Cunningham Park abduction identified Robert Masters in a line-up by his voice, as the armed driver of the car, and she also identified the gun recovered from Masters's home as the gun the driver held during her abduction; and
- The bystander who witnessed the end of the October 19th Bayside abduction identified Masters as the man in the rear set of the automobile fleeing from the school-yard location --where the fifty-seven-year-old victim of the Bayside abduction had been beaten and abandoned.

**H. Masters, Odom, and Williams pleaded guilty.**

52. On August 26th, 1993, Kraigory Odom pleaded guilty to first-degree robbery, the top count of the indictment (Penal Law § 160.15[4]) (Queens County Indictment Number 4768/92). In his allocution, he described the role he played in the October 19th Bayside abduction.

[57] *Id.*

On March 14th, 1994, he was sentenced to an indeterminate term of four and one-half to ten and one-half years in prison.

53. On December 16th, 1993, Jermaine Williams pleaded guilty to first-degree robbery, the top count of the indictment (Penal Law § 160.15[4]) (Queens County Indictment Number 4768/92) for his role in the October 19th Bayside abduction. During his allocution, Williams agreed to testify against Robert Masters in matters relating to the Bayside abduction (Proceedings: 1). On March 29th, 1994, Williams was sentenced to an indeterminate prison term of five to fifteen years.

54. Finally, on March 22nd, 1994, Robert Masters pleaded guilty during the People's case at his trial (Queens County Indictment Number 4768/92). Masters pleaded guilty to two of the three abductions: (a) the October 14th Cunningham Park abduction, and (b) the October 19th Bayside abduction. On April 25th, 1994, Masters was sentenced to concurrent terms of imprisonment of five and one-half to sixteen and one-half years for each of the Robbery in the First-degree, Kidnapping in the Second-degree, and Aggravated Sex Abuse in the First- degree convictions; five to fifteen years for each of the Robbery in the Second-degree convictions; and two and one-third to seven years for each of the Sexual Abuse in the First-degree and Assault in the Second-degree convictions.

55. In sum, Masters, Odom, and Williams each pleaded guilty in the Bayside case. Robert Masters, alone, pleaded guilty in the Cunningham Park case. And none of the men pleaded guilty or gave an allocution in reference to the October 11th case, where Williams had been identified and the abductors robbed the couple at the same ATM location that was used in the September 2, Borough Park abduction.

## I. Earl Walters's Trial Proceedings

### *(1) Huntley hearing*

56. Walters moved to suppress his video statement on the ground that it was coerced, and the court granted a hearing that occurred in June and July of 1993. Detective Navarra testified and described the interrogation and introduced the video statement that he was present for. The People also made a record that they did not intend to introduce identification testimony. Walters and his father testified on Walters's behalf. His father described the circumstances when police took Walters to the precinct for questioning. And Walters testified that his confessions were false (July 6, 1993, H: 53, 67, 70-71, 78-79). He stated that the information in the statements was provided to him by Detective Navarra during the interrogation and "guided tour all over the place" (H: 52-53, 70, 76). And he testified that throughout, he believed that he would be released after he made his statements, specifically that Detective Navarra "told me was if you cooperate and do what you could do, you can go home" (H: 60, 68).

57. In a September 8th, 1993, decision and order (Appelman, J.), the court denied defendant's motion to suppress his video statement and to preclude the complainant from testifying about the description that she gave to the police. In its decision, the court noted that it was the People's position that the woman who was abducted from Borough Park was unable to make an identification.[58] The court further found that there was no evidence that Walters was ill-treated

---

[58] September 8, 1993, decision at n. 1.

and found that he had been fed between 9:00 and 10:00 p.m., before he had made his video statement. Considering the video statement, Justice Appleman observed during the hearing that:

> After watching [the videotaped statement] for outside of thirty-five or forty minutes, I'm convinced that nobody used a rubber hose and his *Miranda* rights were given . . . (June 11, 1993, H: 16).

The voluntariness of Walters's prior written statements was not litigated at the suppression hearing because the People took the position that they had not given defendant notice of them and did not intend to use them at trial.[59]

***(2) Trial and conviction***

58. Walters's trial began on January 6th, 1994. The People's case against Walters relied on Walters's confessions and the tentative identification[60] by the September 2nd, Borough Park, victim. The QSVS detective testified about the victim's activities at Walters's lineup, his investigation, information he provided to Walters, and Walters's admissions. The interviewing ADA testified about Walters's video confession. The woman abducted in Borough Park testified about her abduction and her identification of Walters after first choosing two fillers in the November 24th, 1992, lineup. The fifty-seven-year-old Flushing victim testified about her abduction, robbery, and sexual assault. Various law enforcement officers described taking

[59] *Id.*

[60] During his opening, defense counsel brought up the irregular identification procedure involving the September 2nd victim and argued that it was evidence of police misconduct (Proceedings: 367-70, 378, 392). The Court then determined that this argument opened the door for the People to present evidence of the identification in their case in chief.

statements and offering aid to the victims. And bank representatives established the ATM transactions related to the robberies.

59. The defense case was limited to the testimony of two police officers who interviewed the victims prior to Walters's arrest. Through the officers' testimony, the defense elicited some inconsistencies in each of the victim's prior descriptions of the perpetrators.

60. On March 22nd, 1994, Walters was convicted of Robbery in the First Degree (Penal Law § 160.15[4]), two counts of Robbery in the Second Degree (Penal Law § 160.10[1] and [2][a]), Assault in the Second Degree (Penal Law §120.05) and Kidnapping in the Second Degree (Penal Law § 135.20). He was sentenced to a prison term of twelve and one-half to twenty-five years for the first-degree robbery, from five to fifteen years for one count of second-degree robbery, from two and one-third to seven years for the assault, and from eight and one-third to twenty-five years for the kidnapping, all to be served concurrently. For the second count of second-degree robbery, the court imposed a consecutive sentence of from five to fifteen years' incarceration (Appelman, J., at trial and sentence).[61]

### J. Appeal and post-conviction proceedings

61. On April 19th, 1994, Walters filed a direct appeal to the Appellate Division raising claims or error relating to jury selection, the prosecutor's summation, and the court's instructions to the jury. On November 24th, 1997, the Appellate Division unanimously affirmed Walters's

[61] The jury acquitted Walters of the sex crimes and some charges involving injury or use of weapons.

conviction. *People v. Walters*, 244 A.D.2d 587 (2d Dept. 1997). On February 17th, 1998, the Court of Appeals (Ciparick, J.), denied Walters's application for leave to appeal. *People v. Walters*, 91 N.Y.2d 930 (1998).

62. On September 28th, 1998, Walters filed a CPL § 440.10 motion to vacate his judgment of conviction and attempted to litigate the voluntariness of his confession on the merits. Walters argued that his confession should have been suppressed because:

- It was obtained by the police through psychological coercion;
- His right to counsel had been circumvented by police because they had arrested him without an arrest warrant, and thus, his confession was the fruit of unlawful police action; and
- The police had violated Walters's right to counsel when they questioned him.[62]

63. On October 19th, 1998, the court denied Walters's motion to vacate his conviction without reaching the merits of his claim (Katz, J.). The court found that Walters's claims were procedurally barred, either pursuant to New York Criminal Procedure Law § 440.10(2)(c), or 440.10(3)(a) for his unjustifiable failure to litigate the claim previously or to make a record sufficient for its litigation. Leave to appeal this decision was denied on January 28th, 1999, when the Honorable Thomas Sullivan denied defendant's motion.

64. On July 29th, 1999, Walters filed a petition for *habeas corpus* relief in the Eastern District of New York (99-CV-4331[ARR]). On June 30, 2000, the Honorable Allyne R. Ross, United States District Judge, denied Walters's petition. On July 7th, 2000, the United States

[62] September 28, 1998, § 440.10 motion.

District Court for the Eastern District of New York denied Walters's application for a certificate of appealability.

**K. The 2007-2013 reinvestigation of Walters's case, and Walters's release to Parole**

65. In 2007, the People agreed to have OCME perform DNA testing on physical evidence at the defendant's request. The only evidence available for testing came from the September 24th abduction.[63] This DNA-centered reinvestigation continued from the summer of 2007 through the summer of 2013.

66. A sample taken from the victim's skirt provided the only DNA result that did not belong to the victim. However, this was a partial DNA mixture only suitable for comparison—it could not be compared to a DNA database of offenders. Walters was excluded as a possible contributor to this mixture. Although Masters, Odom, and Williams were suggested by defense counsel as possible alternative suspects, no samples from these men were obtained or compared. No request was made to re-examine the fingerprint evidence at that time.

67. During the pendency of this Office's 2007-2013 investigation, Earl Walters was released to the Division of Parole. On November 13th, 2012, Walters appeared before the Parole Board. Against the advice of counsel, who recommended that Walters not speak about his crimes, Walters asserted that he was innocent of the crimes for which he was prosecuted under Queens County Indictment Number 4505/92. In contrast, Walters admitted his guilt of two robberies that

[63] *See supra* Part A (1) (No physical evidence collected from September 2nd abduction).

he had committed with Dean Black under Queens County Indictment number 3007 of 1992. Walters explained:

> "What I really want to say outside of all of that is that I told a lie about myself 20 years ago, I said something I didn't do. I cost myself—cost me 20 years in prison and, again, I I'm in another position in my life where all I have is the truth, and the truth itself might cost me, but I have to stand on that because—because I can't change the truth. The truth is, yes, I am innocent and I am sorry for what happened to the ladies.[64]

**L. The CIU investigation discovered fingerprint evidence inculpating Masters and Williams and exculpating Walters.**

68. Now, represented by attorneys Rebecca Freedman and Glenn Garber of The Exoneration Initiative, Walters applied for review by the CIU in 2020. Through counsel, Walters asked that any fingerprints associated with the September 2nd, and 24th cases be compared through the ABIS[65] system or directly compared to Masters, Odom, and Williams. The CIU agreed and arranged for all of the fingerprint evidence in the case be re-examined by the NYPD Latent Print Section.

***(1) New latent fingerprint comparisons***

69. Without naming Masters, Odom, and Williams as potential suspects, the CIU asked the NYPD Latent Print Section [LPS] to re-examine the fingerprint evidence in Walters's case and

[64] November 13, 2012, Parole Board Hearing minutes at p. 12.

[65] ABIS is the Automatic Biometric Identification System, that supports fingerprint, face, and iris recognition for large-scale biometric identification.

compare all suitable prints against the ABIS database. In a February 15, 2022, report, the LPS indicated that the ABIS system identified Jermaine Williams as a candidate requiring further examination and then the LPS identified him as the source of prints on the stolen Mazda used by the perpetrators in the September 24th abduction. The LPS's subsequent examination identified three prints on the Mazda as Williams's.[66] In May of 2022, a subsequent manual fingerprint comparison identified Robert Masters as contributing a fingerprint to the driver's door of the same Mazda. The LPS reports reflecting these comparisons are attached as Appendix A to this affirmation. The LPS excluded Earl Walters, Dean Black, and Craig Jackson from all remaining fingerprint evidence suitable for comparison in the September 24 case.

70. Both Williams and Masters were interviewed by the CIU after they were identified as the source of the fingerprints. Williams denied any association with the grey Mazda and failed to provide any innocent explanation for why his prints would be found on the vehicle left by the perpetrators at the scene of the abduction. Masters declined to provide any relevant information.

***(2) Additional DNA comparison***

71. All the physical evidence in this case has now been tested and examined, and/or inadvertently lost or destroyed while in the custody of NYPD. The only relevant DNA evidence suitable for comparison in the case was the mixture profile previously obtained from the September 24th victim's dress. Walters was already excluded from this sample in 2013. The CIU then sought to compare all remaining suspects. Significantly, Dean Black provided a DNA sample by consent

---

[66] This was after an ABIS search identified him as a candidate requiring further examination.

and was excluded as a possible contributor to the stain as documented in a May 31, 2023, report from OCME—thus eliminating any potential forensic corroboration of Walters's confession. Masters and Williams declined to provide the CIU with a DNA sample and Odom is deceased.

## APPLICATION

### M. Walter's Conviction Should be Vacated Pursuant to C.P.L. § 440.10 (1)(g).

72. Since the newly-discovered fingerprint evidence is of a kind that if admitted at trial would probably have resulted in a verdict more favorable to Earl Walters, Walters's conviction should be vacated pursuant to C.P.L. § 440.10 (1)(g). And because there is no additional reliable evidence supporting his prosecution in this case, the indictment should be dismissed.

73. C.P.L. § 440.10 (1)(g) provides for the vacatur of a conviction where there is "new evidence . . . of such character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to the defendant." Consistent with statute, the Appellate Division has applied a six-part test for reviewing newly-discovered evidence pursuant to C.P.L. § 440.10 (1)(g): (1) It must be such as will probably change the result if a new trial is granted; (2) It must have been discovered since the trial; (3) It must be such as could have not been discovered before the trial by the exercise of due diligence; (4) It must be material to the issue; (5) It must not be cumulative to the former issue; and, (6) It must not be merely impeaching or contradicting the former evidence. *People v. Malik*, 81 A.D.3d 981, 981-82 (2d Dept. 2011) (internal quotation marks omitted). In assessing these factors, "the new evidence must be considered in the context of the relative strength of the People's evidence of guilt." *People v. Hargrove*, 162 A.D.3d 25, 66 (2d Dept 2018).

74. The fingerprint evidence discovered in the CIU investigation of this case satisfies each of the criteria propounded by the Appellate Division. It is material and would probably change the result if a new trial were granted. *See Malik*, 81 A.D.3d at 981-82 (factors 1 & 4). The new fingerprint evidence implicates Robert Masters and Jermaine Williams in the September 24th abduction, thus exculpating Walters of that crime. And where Walters was tried for both crimes together based on confessions obtained during the same interrogation, the newly discovered forensic evidence would probably change the result as to all charges for which he was convicted.

## N. The new fingerprint evidence directly implicates Masters and Williams in the September 24th abduction.

75. The new fingerprint evidence directly implicates Masters and Williams by linking them to the stolen Mazda used in the September 24th abduction. From the beginning of the case, investigators and prosecutors took as given that the stolen Mazda was the car used by the perpetrators. It was found unattended and running with a cracked ignition, at about 2:47 a.m. at the location where the victim was abducted. While the victim never specifically identified the car, she gave a rough description that fit it at trial — as light-colored beige or grey (Trial: 1007).

76. The car theft location in Baldwin Long Island, and the time span between the car's theft and the Flushing victim's abduction were consistent with Masters and Williams being the perpetrators. The Mazda was stolen from a residential cul-de-sac in Baldwin, Long Island, less than five miles from Master's and Williams's homes in Hempstead, Long Island.[67] The Mazda's

[67] Crime Report p. 1.

owner parked his car at about 6:00 p.m. The Flushing victim was abducted at about midnight the same night. Some time may have passed between the time the car was parked and the time it was stolen, narrowing the six-hour time frame. And, because this was a crime of opportunity against a stranger, rather than a carefully timed and meticulously planned event, it is reasonable to infer that the abductors spent more than the one-half hour to forty minutes it would normally have taken to drive directly from Baldwin to the Flushing abduction location looking for a victim.

77. An extensive background investigation was conducted into the possibility that Walters was associated with the Long Island men.[68] This investigation revealed no evidence that Walters or his associates was connected to Masters, Odom, and Williams. The CIU also interviewed Walters, Black, Jackson, Masters, Williams, and several associates and/or family members of these men—none indicated any connection between Walters and the three Long Island men. Moreover, Williams false denial of any contact with the grey Mazda when interviewed by the CIU is evidence of consciousness of his guilt. *See People v. Levine*, 65 N.Y.2d 845, 847 (1985) (false statement distancing oneself from time and place of crime is evidence of consciousness of guilt); *Faulkner v. State*, 468 Md. 418, 469, 227 A.3d 584, 613 (2020) (alternative suspect's false denial of visiting crime scene where his fingerprints were found cited as evidence of defendant's innocence).

---

[68] This background investigation was conducted by The QCDA Crime Strategies and Intelligence Unit, QCDA detectives, and DOCCS.

## O. Pattern evidence suggests that the same people could have been responsible for all five crimes.

78. The five crimes, spanning September and October 1992, may be associated by the following pattern evidence:

- In the September 2nd, September 24th, October 11th, and October 19th cases the perpetrators attempted to obtain money from the victims' accounts at ATMs.
- In the September 2nd and October 11th cases, the abductors used the same Citibank location in Jamaica to rob the victims.
- In the September 2nd, September 24th, October 11th, and October 19th cases, the perpetrators approached victims as they were exiting their vehicles, just after having parked on residential streets.
- In the September 2nd, September 24th, and October 11th cases, the victims identified their abductors as having Jamaican accents.[69]
- In the September 2nd, September 24th, October 11th, and October 19th cases, the perpetrators forced their victims onto the floor of the car's backseat and one of them sat in the rear with the victim.
- In the September 2nd, September 24th, and October 11th cases, the perpetrators covered the victims with clothing/blankets.
- In the September 2nd, October 11th, and October 14th cases, the perpetrators stole jewelry from the victims.
- In four of the five cases, September 24th, October 11th, October 14th, and October 19th cases, the perpetrators sexually assaulted the female victims.

[69] The female October 11 victim described both perpetrators as having Jamaican accents, while the September victims only described the driver as having a Jamaican accent.

79. These similarities support a conclusion that this pattern of carjackings, sex assaults, and robberies was committed by the same perpetrators. A sufficiently unique *modus operandi* can establish a defendant's identity as the perpetrator of a crime. *People v. Sanchez*, 154 A.D.2d 15 (1st Dept. 1990). It need not be "unique" in the literal sense; the Court of Appeals has explained that modus operandi evidence is admissible even when other, unrelated, crimes also coincidentally show the same modus operandi. *People v. Beam*, 57 N.Y.2d 241 (1982). It is enough that it be "distinctive." *Beam*, 57 N.Y.2d at 253; *People v. Keller*, 215 A.D.2d 502 (2d Dept. 1995). It is the pattern when viewed as a whole that must be unusual. *Beam*, 57 N.Y.2d at 253. And, if it is sufficiently unique, it may be submitted for the jury's consideration. *People v. Allweiss*, 48 N.Y.2d 40, 47-48 (1979).

**P. The fingerprint evidence implicating Masters and Williams, if it had been presented to the jury, would probably have resulted in a more favorable verdict as to each count for which Walters was convicted.**

80. Walters was tried jointly for the September 2nd and 24th abductions based on confessions obtained during a single interrogation. His defense at trial was that his confessions were false and the product of a lengthy and coercive interrogation. The newly-discovered fingerprint evidence implicating Masters and Williams in the September 24th abduction contradicts Walters's statement that he was an accessory to that crime. The September and October abductions fell within the same pattern. In light of the pattern, the newly discovered evidence makes his confession to the September 2nd abduction unreliable.

81. Finally, the identification evidence developed during the initial investigation of this case was weak. Only one of the two victims even offered a tentative identification that implicated

Walters. And at the lineup, she picked out two fillers before conferring with a detective and picking out defendant. Consistently, as memorialized by the court, by the time of the suppression hearing the People had declined to provide 710.30 notice because the September 2nd victim "was unable to make an identification."

82. Considering the evidence as a whole, Walters's confessions do not carry sufficient weight to sustain his conviction in light of the newly-discovered fingerprint evidence implicating Masters and Williams. Accordingly, the elements of C.P.L. § 440.10 (1)(g) are met with regard to Walters's convictions for both the September 2nd and 24th abductions.

***

**WHEREFORE**, the People respectfully request that this Court grant the joint motion to vacate Walters's convictions under Queens County Indictment Number 4505/92, pursuant to section 440.10 (1)(g) of the Criminal Procedure Law and enter an order vacating his conviction under that indictment. Upon vacatur of the conviction, the People further request that Indictment Number 4505/92 be dismissed because there is no additional, reliable evidence of Walters's guilt.

Dated: Kew Gardens, New York
August 23, 2023

John F. McGoldrick
Assistant District Attorney

jfmcgoldrick@queensda.org

# APPENDIX A

| | | Crime/Condition | Command |
|---|---|---|---|
| ANAB ANSI National Accreditation Board ACCREDITED ISO/IEC 17020 FORENSIC INSPECTION AGENCY | **LPS Report of Examination** | RAPE | 109<br>**Date of This Report**<br>05/12/2022 |

| Date Reported | Complaint No. | Date Assigned | Case No. | Unit Reporting | Follow-Up No. |
|---|---|---|---|---|---|
| 09/24/1992 | 1992-109-19552 | 02/15/2022 | 1365C-1992 | LATENT PRINT | 2 |

| Activity Date | Activity Time |
|---|---|
| 05/12/2022 | 1800 |

**Topic/Subject:**
**(LPS Report of Examination)** REPORT OF EXAMINATION - SUPPLEMENTAL

**Date(s) of Examination**
02/15/2022, 05/11/2022-05/12/2022

**LPS Case Number**
1365C-1992

**Number of Latent & Digital Prints**

| Type | Latent# | # of Impression | Recovered From |
|---|---|---|---|
| LATENT | 1 | 1 | DRIVER SIDE DOOR O/S |
| LATENT | 2 | 1 | DRIVER SIDE DOOR O/S |
| LATENT | 3 | 1 | ROOF ABOVE DRIVERS SIDE REAR DOOR |
| LATENT | 4 | 1 | ROOF ABOVE DRIVERS SIDE REAR DOOR |
| LATENT | 5 | 1 | FRONT DOOR FRAME |
| LATENT | 1(A) | 1 | AUTO TRUNK OUTSIDE |
| LATENT | 2(A) | 1 | AUTO TRUNK OUTSIDE |
| LATENT | 3(A) | 1 | MONEY MACHINE |
| **Total Number of Impressions:** 8 | | | |
| **Latent Impression Was Determined To Be** OF VALUE | | **Count** 8 | |

**Suspects, Eliminations & Others**

| | Person Role | Last Name | First Name | Sex | Race | DOB | Age | NYSID# | FBI# |
|---|---|---|---|---|---|---|---|---|---|
| | OTHER | WILLIAMS | JERMAINE L. | M | B | [redacted] | | | N/A |
| | SUSPECT | ODOM | KRAIGORY | M | B | [redacted] | | [redacted] | N/A |
| | SUSPECT | MASTERS | ROBERT C. | M | B | [redacted] | | [redacted] | N/A |

ll

**LPS Case Number:** 1365C-1992

| | | |
|---|---|---|
| **Latent #**<br>1 | **Recovered From**<br>DRIVER SIDE DOOR O/S | |
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>IDENTIFICATION |
| #1 **Latent impression, upon comparison and evaluation of impression** - IS IDENTIFIED TO THE #3 FINGER OF ROBERT C. MASTERS – NYSID # [redacted] | | |
| **ABIS Search**<br>YES | **If no, Please explain why?** | **ABIS Result**<br>NEGATIVE RESULTS |

| | | |
|---|---|---|
| **Latent #**<br>2 | **Recovered From**<br>DRIVER SIDE DOOR O/S | |
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>IDENTIFICATION |
| #2 **Latent impression, upon comparison and evaluation of impression** - IS IDENTIFIED TO THE RIGHT PALM OF JERMAINE L. WILLIAMS – NYSID # [redacted] | | |
| **ABIS Search**<br>YES | **If no, Please explain why?** | **ABIS Result**<br>CANDIDATE REQUIRING FURTHER EXAMINATION. |

| | | |
|---|---|---|
| **Latent #**<br>3 | **Recovered From**<br>ROOF ABOVE DRIVERS SIDE REAR DOOR | |
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>IDENTIFICATION |
| #3 **Latent impression, upon comparison and evaluation of impression** - IS IDENTIFIED TO THE RIGHT PALM OF JERMAINE L. WILLIAMS – NYSID # [redacted] | | |
| **ABIS Search** | **If no, Please explain why?** | **ABIS Result** |

| | | |
|---|---|---|
| **Latent #**<br>4 | **Recovered From**<br>ROOF ABOVE DRIVERS SIDE REAR DOOR | |
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>IDENTIFICATION |
| #4 **Latent impression, upon comparison and evaluation of impression** - IS IDENTIFIED TO THE RIGHT PALM OF JERMAINE L. WILLIAMS – NYSID # [redacted] | | |
| **ABIS Search**<br>YES | **If no, Please explain why?** | **ABIS Result**<br>CANDIDATE REQUIRING FURTHER EXAMINATION. |

**LPS Case Number:** 1365C-1992

| **Latent #**<br>5 | **Recovered From**<br>FRONT DOOR FRAME | |
|---|---|---|
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>EXCLUSION |
| #5 **Latent impression, upon comparison and evaluation of impression -** JERMAINE L. WILLIAMS IS EXCLUDED FROM BEING THE SOURCE OF THIS IMPRESSION. | | |
| **ABIS Search**<br>YES | **If no, Please explain why?** | **ABIS Result**<br>NEGATIVE RESULTS |

| **Latent #**<br>1(A) | **Recovered From**<br>AUTO TRUNK OUTSIDE | |
|---|---|---|
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>EXCLUSION |
| #1(A) **Latent impression, upon comparison and evaluation of impression-** JEMAINE L. WILLIAMS IS EXCLUDED FROM BEING THE SOURCE OF THIS IMPRESSION. | | |
| **ABIS Search**<br>YES | **If no, Please explain why?** | **ABIS Result**<br>NEGATIVE RESULTS |

| **Latent #**<br>2(A) | **Recovered From**<br>AUTO TRUNK OUTSIDE | |
|---|---|---|
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>EXCLUSION |
| #2(A) **Latent impression, upon comparison and evaluation of impression** - JEMAINE L. WILLIAMS IS EXCLUDED FROM BEING THE SOURCE OF THIS IMPRESSION. | | |
| **ABIS Search**<br>YES | **If no, Please explain why?** | **ABIS Result**<br>NEGATIVE RESULTS |

| **Latent #**<br>3(A) | **Recovered From**<br>MONEY MACHINE | |
|---|---|---|
| **Latent Impression Was Determined To Be**<br>OF VALUE | **Suspect/Elimination/Other**<br>YES | **Comparison/Evaluation Result**<br>EXCLUSION |
| #3(A) **Latent impression, upon comparison and evaluation of impression** – JERMAINE L. WILLIAMS IS EXCLUDED FROM BEING THE SOURCE OF THIS IMPRESSION | | |
| #3(A) **Latent impression, upon comparison and evaluation of impression** – KRAIGORY ODOM IS EXCLUDED FROM BEING THE SOURCE OF THIS IMPRESSION | | |
| #3(A) **Latent impression, upon comparison and evaluation of impression** – ROBERT C. MASTERS IS EXCLUDED FROM BEING THE SOURCE OF THIS IMPRESSION | | |
| **ABIS Search**<br>YES | **If no, Please explain why?** | **ABIS Result**<br>NEGATIVE RESULTS |

rl

**LPS Case Number:** 1365C-1992

**Follow-up Information**

**Identification** - A conclusion that two friction ridge skin impressions originated from the same source. An inductive inference that the probability that the two impressions were made by different sources is so minute that it is negligible.
**Inconclusive** - A conclusion that there is insufficient quantity and/or clarity of corresponding friction ridge skin features between two impressions such that the examiner is unable to identify or exclude the two impressions as originating from the same source.
**Exclusion** - A conclusion that two friction ridge skin impressions did not originate from the same source. There are sufficient friction ridgeskin features in disagreement to conclude that the two impressions came from different sources.

**I CONCUR WITH THE PREVIOUS EXAMINERS FINDING.**

**DEAN BLACK [redacted] IS EXCLUDED FROM LATENTS : # 1, # 5, #1(A), #2(A), #3(A).**

**CRAIG JACKSON [redacted] IS EXCLUDED FROM LATENTS : # 1, # 5, #1(A), #2(A), #3(A).**

**EARL WALTERS [redacted] IS EXCLUDED FROM LATENTS : # 1, # 5, # 1(A), # 2(A), # 3(A).**

| **Eliminations** |
|---|
| **Eliminations Required** |

**Reviewed By**

**Peer Review:**

| **Tax ID** | **Name** | **Rank** | **Command** |
|---|---|---|---|
| [redacted] | CYNTHIA RAMIREZ | DT1 | 207 |

**Performance Verification:**

| **Tax ID** | **Name** | **Rank** | **Command** |
|---|---|---|---|
| [redacted] | GERVONNI KEMP | AFT4 | 207 |

**Supplemental Notes**

| **Supervisor Note** | **Supplemental Notes** |
|---|---|
| | KRAIGORY ODOM DOES NOT HAVE PALM PRINTS ON FILE IN THE CITY, STATE OR FBI DATABASES<br>ROBERT C. MASTERS DOES NOT HAVE PALM PRINTS ON FILE IN THE CITY, STATE OR FBI DATABASES<br>PEER REVIEW BY DT3 JESSICA ORTIZ TAX [redacted]<br>PERFOMANCE VERIFICATION BY AFT4 GERVONNI KEMP TAX [redacted] |

| | | | | |
|---|---|---|---|---|
| **Reporting Officer:** | **Rank/Name:** DT3 | **Signature:** [signature] | **Tax Reg. No** [redacted] | **Command** 207-LATENT PRINT UNIT |
| **Reviewing Supervisor:** | **Signature:** [signature] | **Date Reviewed/Date Report Issued:** 5/12/22 | **Name** MARK SLAWIK | **Supv. Tax No.** [redacted] |